Citation Nr: AXXXXXXXX
Decision Date: 05/28/21 Archive Date: 05/28/21

DOCKET NO. 200406-138238
DATE: May 28, 2021

ORDER

Prior to July 29, 2019, entitlement to an increased initial rating of 70 percent for posttraumatic stress disorder (PTSD) is granted.

Entitlement to an initial rating in excess of 70 percent for PTSD is denied.

Entitlement to a rating in excess of 10 percent for postoperative arthroscopy of the left knee is denied.

Entitlement to an initial rating in excess of 10 percent for bilateral hearing loss is denied.

Entitlement to an initial rating in excess of 10 percent for bilateral tinnitus is denied.

Entitlement to an initial rating in excess of 10 percent for degenerative disease of the cervical spine (claimed as a neck condition) is denied.

REMANDED

Entitlement to service connection for sleep apnea is remanded.

Entitlement to service connection for headaches is remanded.

Entitlement to a total disability rating based upon individual unemployability (TDIU) is remanded.

Entitlement to special monthly compensation (SMC) based on aid and attendance/housebound status is remanded.

FINDINGS OF FACT

1. For the entire appeal period, the Veteran's PTSD was productive of occupational and social impairment with deficiencies in most areas due to such symptoms as suicidal ideation; total social and occupational impairment as a result of PTSD was not shown.

2. The Veteran failed to report for a VA examination scheduled in September 2019 in connection with his claim for increase for his service-connected left knee disability; he did not report for this examination with no good cause provided.

3. For the entire appeal period, audiological testing demonstrated the Veteran's bilateral hearing loss was manifested by, at worst, Level VI hearing acuity in the right ear and Level II hearing acuity in the left ear.

4. The Veteran's bilateral tinnitus is assigned a 10 percent rating, which is the maximum rating authorized under Diagnostic Code (DC) 6260.

5. The Veteran's cervical spine disability was not shown to result in forward flexion of the cervical spine greater than 15 degrees but not greater than 30 degrees; or combined range of motion of the cervical spine not greater than 170 degrees; or muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis.

CONCLUSIONS OF LAW

1. Prior to July 29, 2019, the criteria for an increased initial rating of 70 percent for PTSD were met; the criteria for a rating in excess of 70 percent were not met any point during the appeal period. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.159, 4.130, DC 9411.

2. The claim for a rating in excess of 10 percent for a left knee disability must be denied as a matter of law since the Veteran did not report for the scheduled examination. 38 C.F.R. § 3.655.

3. The criteria for an initial rating in excess of 10 percent for bilateral hearing loss were not met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.159, 4.85, 4.86, DC 6100.

4. The criteria for an initial rating in excess of 10 percent for bilateral tinnitus were not met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.159, 4.87, DC 6260.

5. The criteria for an initial rating in excess of 10 percent for a cervical spine disability were not met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.159, 4.71(a), DC 5237.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served on active duty from July 1979 to September 1992 and from March 2008 to April 2012.

These matters come before the Board of Veterans' Appeals (Board) from an October 2019 rating decision of a Department of Veterans Affairs (VA) Regional Office (RO). 

The appeal dates back to a May 2012 claim the Veteran filed with VA, wherein he sought service connection for, in pertinent part, PTSD, to include anxiety disorders, sleep apnea, a neck condition, bilateral tinnitus, and bilateral hearing loss. In a December 2013 rating decision, the RO granted service connection for PTSD (rated as 30 percent disabling) and for a cervical spine disability (10 percent); reinstated a prior 10 percent rating for a left knee disability; and denied service connection for sleep apnea, bilateral tinnitus, and bilateral hearing loss. The Veteran appealed those decisions in January 2014 and June 2014 notices of disagreement (NODs). 

In January 2018, the Veteran opted into the RAMP program under the modernized appeals process. The RO issued a RAMP rating decision in March 2018 which, in pertinent part, granted service connection for bilateral hearing loss and bilateral tinnitus, assigning initial 10 percent ratings, each, for those disabilities. In August 2018, the Veteran filed a supplemental claim for four of the issues listed above (service connection for sleep apnea and increased ratings for PTSD, a left knee disability, and a cervical spine disability), as well as entitlement to an increased rating for a lumbar spine disability. 

Meanwhile, in July 2017, the Veteran filed a claim for service connection for headaches and SMC benefits. Those issues were denied in an October 2017 rating decision. The Veteran filed a timely NOD in March 2018 in which he requested the Decision Review Officer process. In a February 2019 RAMP rating decision, the RO readjudicated the claims, despite the fact the Veteran never explicitly elected to opt in to the modernized appeal system; the RO acknowledged this mistake in a Deferred Rating issued later that month, which noted the claims would be processed under the Legacy appeals system. However, the Veteran was never notified of these irregularities. In July 2019, he filed a supplemental claim, including his claim for service connection for headaches, citing the February 2019 RAMP rating decision that was issued in error.

With respect to the claim for service connection for headaches, the Board finds the RO mistakenly characterized the claim as whether new and relevant evidence was received to readjudicate the claim. VA need not determine whether new and relevant evidence has been received with respect to the headaches claim, because the October 2017 Legacy rating decision never became final and because the February 2019 RAMP rating decision was issued in error. Rather, the claim is properly characterized as simply a claim for service connection.

In October 2019, the RO issued the rating decision on appeal, addressing all of the issues listed on the title page. Notably, the rating decision did not adjudicate the Veteran's claim for an increased rating for a lumbar spine disability (as identified in his August 2018 supplemental claim). Thus, as a preliminary matter, the Board finds this issue must be adjudicated in the first instance by the RO. 

In April 2020, the Veteran filed the instant NOD, citing his disagreement with "all of the issues listed" on the October 2019 rating decision. The Veteran subsequently clarified he desired direct review of the claims by a Veterans Law Judge (VLJ). Therefore, the Board may only consider the evidence of record at the time of the AOJ decision on appeal. 38 C.F.R. § 20.301. The Board notes the Veteran's lawyer raised the issue of entitlement to a TDIU in his April 2020 brief. This claim is part and parcel of the increased rating claims on appeal. See Rice v. Shinseki, 22 Vet. App. 447 (2009).

Pursuant to the Veterans Claims Assistance Act (VCAA), VA has duties to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C. §§ 5102, 5103, 5103A, 5107 (2012); 38 C.F.R. § 3.159 (2020).

Regarding the issues decided herein, neither the Veteran nor his lawyer have raised any issues with the duty to notify or duty to assist. See Scott v. McDonald, 789 F.3d 1375, 1381 (Fed. Cir. 2015) (holding that "the Board's obligation to read filings in a liberal manner does not require the Board . . . to search the record and address procedural arguments when the veteran fails to raise them before the Board"); Dickens v. McDonald, 814 F.3d 1359, 1361 (Fed. Cir. 2016). 

The Board notes VA attempted to schedule the Veteran for VA examinations in September 2019 for his PTSD, left knee disability, and cervical spine disability; however, the Veteran did not appear for those examinations, with no good cause provided. While VA has a statutory duty to assist in developing evidence pertinent to a claim, the Veteran also has a duty to assist and cooperate with VA in developing evidence. The duty to assist is not a one-way street. Wood v. Derwinski, 1 Vet. App. 190 (1991). VA's duty must be understood as a duty to assist the Veteran in developing his claim, rather than a duty on the part of VA to develop the entire claim with the Veteran performing a passive role. Turk v. Peake, 21 Vet. App. 565 (2008). Therefore, the Board finds, with respect to those claims, that remands for additional examinations are not warranted. (As discussed in the Remand below, the Board does find that remands are warranted to obtain medical opinions with respect to the Veteran's claims for service connection for sleep apnea and headaches, as he has put forth medical evidence suggesting entitlement to the benefits sought.)

Increased Rating Claims

Disability ratings are determined by evaluating the extent to which a veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the Schedule for Rating Disabilities (Rating Schedule). 38 U.S.C. § 1155; 38 C.F.R. §§ 4.1, 4.2, 4.10.

If two evaluations are potentially applicable, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that evaluation; otherwise, the lower evaluation will be assigned. 38 C.F.R. § 4.7. The veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995).

1. PTSD

The Veteran's PTSD is rated as 30 percent disabling prior to July 29, 2019, and 70 percent disabling thereafter. The Veteran's lawyer asserted in an April 2020 brief that a uniform initial rating of 70 percent is warranted for the entire appeal period. 

The Veteran's PTSD symptoms are rated under 38 C.F.R. § 4.130, DC 9411. All psychiatric disabilities are evaluated under a general rating formula for mental disorders.

Under the general rating formula, a 30 percent rating is warranted for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood; anxiety; suspiciousness; panic attacks (weekly or less often); chronic sleep impairment; and mild memory loss (such as forgetting names, directions, recent events). Id.

A 50 percent rating is warranted for occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g. retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Id.

A 70 percent evaluation is warranted for occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately, and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful situations (including work or a worklike setting); and inability to establish and maintain effective relationships. Id.

Finally, a total schedular rating of 100 percent is warranted when the disorder results in total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of mental and personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. Id.

The symptoms listed in the rating schedule are not intended to constitute an exhaustive list, but rather serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. See Mauerhan v. Principi, 16 Vet. App. 436 (2002). Nevertheless, all ratings in the general rating formula are associated with objectively observable symptomatology, and in Vazquez-Claudio v. Shinseki, 713 F.3d 112, 117 (Fed. Cir. 2013), the Federal Circuit stated that "a veteran may only qualify for a given disability rating under § 4.130 by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration."

The Federal Circuit further noted that "§ 4.130 requires not only the presence of certain symptoms but also that those symptoms have caused occupational and social impairment in most of the referenced areas." Id. Thus, "[a]lthough the veteran's symptomatology is the primary consideration, the regulation also requires an ultimate factual conclusion as to the veteran's level of impairment in 'most areas.'" Id. at 118.

As such, the Board will consider both the Veteran's specific symptomatology as well as the occupational and social impairment associated with the DC to determine whether an increased evaluation is warranted.

As with all claims for VA disability compensation, the Board must assess the credibility and weigh all the evidence, including lay and medical evidence, to determine its probative value, accounting for evidence which it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. Madden v. Gober, 125 F.3d 1477, 1481 (Fed. Cir. 1997), cert denied, 523 U.S. 1046 (1998).

When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the Veteran's capacity for adjustment during periods of remission. 38 C.F.R. § 4.126; see Bankhead v. Shulkin, 29 Vet. App. 10, 22 (2017). The rating agency shall assign an evaluation based upon all the evidence of record that bears on occupational and social impairment, rather than solely upon the examiner's assessment of the level of disability at the moment of the examination. Id. When evaluating the level of disability from a mental disorder, the rating agency will consider the extent of social impairment but shall not assign an evaluation solely on the basis of social impairment. Id.

The "such symptoms as" language means "for example," and does not represent an exhaustive list of symptoms that must be found before granting the rating of that category. Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). The list of examples provides guidance as to the severity of symptoms contemplated for each rating. Id. However, this fact does not make the provided list of symptoms irrelevant. See Vasquez-Claudio v. Shinseki, 713 F.3d 112, 11617 (Fed. Cir. 2013). The Veteran must still demonstrate either the particular symptoms associated with the rating sought, or other symptoms of similar severity, frequency, and duration. Id. at 117.

VA must engage in a holistic analysis that assesses the severity, frequency, and duration of the signs and symptoms of the psychiatric disability; quantifies the level of occupational and social impairment caused by those symptoms; and assigns an evaluation that most nearly approximates the level of occupational and social impairment. Bankhead v. Shulkin, 29 Vet. App. 10, 22 (2017).

The Board notes that the Diagnostic and Statistical Manual, Fourth Edition, allowed for the assignment of Global Assessment of Functioning (GAF) scores, which are a scale reflecting the psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. However, VA regulations were amended to adopt the Diagnostic and Statistical Manual, Fifth Edition (DSM-5), which eliminated the use of GAF scores for evaluating mental illness. 80 Fed. Reg. 14,308 (Mar. 19, 2015). As GAF scores are no longer held to be an effective method of evaluating the severity of psychiatric disabilities, the Board will not rely on any GAF scores in adjudicating the present claim. Golden v. Shulkin, 29 Vet. App. 221, 22426 (2018). Instead, the Board has considered the lay and medical evidence of record to conduct a holistic analysis that considers all associated symptoms and the resulting functional impairment experienced by the Veteran.

The Board further notes the Veteran was scheduled for a VA Compensation and Pension (C&P) examination in September 2019 to evaluate his PTSD. He did not report for this examination. In this regard, under 38 C.F.R. § 3.655(a), when entitlement to a benefit cannot be established without a current VA examination or reexamination and a claimant, without good cause, fails to report for such examination or reexamination, action shall be taken in accordance with 38 C.F.R. § 3.655(b) or (c) as appropriate. When a claimant fails to report for a medical examination scheduled in conjunction with an original compensation claim, without good cause, the claim shall be rated based on the evidence of record. 38 C.F.R. § 3.655(b). Here, as the instant claim dates back to an original claim for service connection, the Board will rate the claim based on the evidence of record.

The appeal period dates from the Veteran's 2012 claim and the RO's grant of service connection for PTSD, effective April 29, 2012. VA mental health treatments notes show the Veteran had a history of suicidal ideation; a clinical note from February 2013 indicated the Veteran actually fired a weapon once while thinking of killing himself.

The Veteran underwent a VA C&P examination in March 2013. The report notes the examiner's determination that diagnoses of PTSD, depressive disorder, and alcohol abuse were appropriate. Overall, the examiner concluded the Veteran's symptoms caused occupational and social impairment due to mild or transient symptoms. The Veteran stated he lived with his wife and cared for his elderly parents. He reported being unable to find work. The Veteran displayed symptoms of irritability with outbursts of anger, difficulty concentrating, depressed mood, anxiety, panic attacks occurring weekly or less often, and chronic sleep impairment. It does not appear from the report that a mental status examination was performed, and there was no discussion of the Veteran's history of suicidal ideation.

In September 2013, the Veteran was seen by a VA nurse practitioner. He reported that he recently quit drinking. He also elaborated on his past suicide attempt, stating a couple years prior he was going to shoot himself but that the gun slipped and he shot the ceiling; he was hospitalized for two weeks thereafter.

In January 2017, the Veteran was admitted for four days for VA inpatient care for his PTSD.

In March 2017 statements, the Veteran's wife and mother described symptoms of panic attacks more frequently than once a week; short- and long-term memory loss; altered thought process; increasing anxiety, particularly in stressful situations; fears of him harming himself or others (the Veteran's mother stated, "He gets this look in his eyes that is so scary"); and neglect with regard to his personal appearance. 

A May 2017 evaluation from a private psychologist notes a finding that the Veteran's mental health symptoms caused occupational and social impairment with deficiencies in most areas. The report noted the Veteran lived with his wife and mother but that he was socially isolated and withdrawn; he also reported drinking a 12-pack daily to self-medicate. The report indicated current symptoms of near-continuous panic or depression affecting the ability to function independently, impairment of short- and long-term memory, disturbances of motivation and mood, inability to establish and maintain effective relationships, suicidal ideation, persistent delusions or hallucinations, persistent danger of hurting self or others, neglect of personal appearance and hygiene, and intermittent inability to perform activities of daily living. On mental status examination, the Veteran's attention was normal but his concentration appeared variable; he struggled remembering basic information. His speech flow was normal and thought content was appropriate. He reported overt hallucinations. The Veteran's judgment was average. The psychologist noted the Veteran's report that he spent a few days in a "mental ward" in 2017 due to flashbacks from smelling diesel fuel, and that he isolated himself in part to avoid physical confrontations with others.

After a thorough review of the evidence, the Board finds that, when resolving reasonable doubt in the Veteran's favor, his PTSD symptoms warrant an increased initial rating to 70 percent. In the aggregate, and particularly in consideration of the reports from the Veteran's VA mental health treatment, statements from his wife and mother, and the May 2017 private psychologist's evaluation, the Board finds the evidence demonstrates that the Veteran suffers from occupational and social impairment with deficiencies in most areas. As noted above, the Veteran has a documented history of suicidal ideation, which is one of the factors included in the 70 percent rating criteria. The Board finds it notable that the March 2013 C&P report, which otherwise appeared to more nearly approximate the criteria for a 30 percent rating, did not address the Veteran's suicide attempt. Moreover, the May 2017 private psychologist's evaluation showed that he presented with several of the symptoms listed in the 70 percent criteria. In light of these symptoms (and given the failure of the C&P report to document the Veteran's suicide attempt and subsequent suicidal ideation), the Board finds, when resolving reasonable doubt in the Veteran's favor, that his overall condition more nearly approximated occupational and social impairment with deficiencies in most areas throughout the appeal period. 

The Veteran's lawyer did not contend a 100 percent rating was warranted, and the Board further finds the criteria for a total rating were not met at any point during the appeal period. In short, it cannot be said that his PTSD resulted in total occupational and social impairmentthe main criterion of a 100 percent ratingas the Veteran has been able to maintain close relationships with his wife and mother. He thus cannot be considered "totally" impaired socially. Furthermore, the May 2017 private psychologist's evaluation did not demonstrate that the Veteran suffered from gross impairment in thought processes or communication, delusions or hallucinations that were persistent in nature (despite hallucinations being observed), grossly inappropriate behavior, disorientation to time or pace, of severe memory loss. The Board is aware the report alluded to the Veteran being in persistent danger of hurting himself or others, as well as being intermittently unable to perform activities of daily living. The psychologist did not specify describe how she came to these findings, however, apart from noting the Veteran's wife had to remind him to do foot shopping and other household chores. No other symptoms of similar severity, frequency, and duration to those listed under the 100 percent criteria have been demonstrated. 

In sum, since the April 29, 2012 effective date of the grant of service connection, the evidence demonstrates the overall impairment caused by the Veteran's PTSD more nearly approximated occupational and social impairment with deficiencies in most areas. Total occupational and social impairment has not been established. Thus, an increased initial rating of 70 percent, but no higher, will be granted.

2. Left knee disability

The Veteran was initially granted service connection for a left knee disability in 1992. Effective March 29, 2008, the award was discontinued, but in the December 2013 rating decision on appeal the RO reinstated a 10 percent rating under DC 5257, effective April 29, 2012. It is unclear why this occurred as the Veteran did not raise any issues pertaining to his left knee in his 2012 claim. Nonetheless, the Veteran appealed the assigned rating.

DC 5257 provides a 10 percent rating for slight subluxation or lateral instability of the knee. A 20 percent rating is warranted for moderate subluxation or lateral instability, and a 30 percent rating is warranted for severe subluxation or lateral instability. 38 C.F.R. § 4.71(a), DC 5257.

In September 2019, the RO tried to schedule the Veteran for a VA examination to determine the nature and severity of his left knee symptoms. The examination request was cancelled, however, because the Veteran was "unavailable." The Veteran has provided no specific argument as to why he is entitled to an increased rating for his left knee disability, nor has he provided good cause for his failure to report for the scheduled examination. (The Board notes the Veteran did report to a C&P hearing loss examination in September 2019.) His lawyer's April 2020 brief did not include any arguments concerning the Veteran's left knee disability. 

As noted above, under 38 C.F.R. § 3.655(a), when entitlement to a benefit cannot be established without a current VA examination or reexamination and a claimant, without good cause, fails to report for such examination or reexamination, action shall be taken in accordance with 38 C.F.R. § 3.655(b) or (c) as appropriate. When a claimant fails to report for a medical examination scheduled in conjunction with an original compensation claim, without good cause, the claim shall be rated based on the evidence of record. 38 C.F.R. § 3.655(b). When the examination was scheduled in conjunction with any other claim, a supplemental claim for a benefit which was previously disallowed, or a claim for increase, the claim shall be denied. Id.

Here, the claim at issue is not an original claim, it is a claim for increase. The Veteran was previously service-connected for his left knee disability, dating back to 1992. As such, the latter provisions of 38 C.F.R. § 3.655(b) apply. Moreover, the Board is unable to establish entitlement to an increased rating without an examination; on review, the record does not contain adequate evidence as to the severity of the Veteran's lateral instability of his left knee. Because the Veteran failed to report for his scheduled VA examination without good cause, the Board must deny the Veteran's claim for increase. See 38 C.F.R. § 3.655(b). The Board notes the Veteran is free to re-file a claim for increase and report to any scheduled VA examinations on conjunction with his claim.

3. Bilateral hearing loss

The Veteran contends his bilateral hearing loss is more severe than what is reflected by his initial 10 percent rating.

Evaluations of bilateral defective hearing range from noncompensable to 100 percent based on organic impairment of hearing acuity as measured by the results of controlled speech discrimination tests together with the average hearing threshold level measured by puretone audiometry tests in the frequencies of 1000, 2000, 3000, and 4000 cycles per second (Hertz). To evaluate the degree of disability for bilateral service-connected defective hearing, the schedule establishes 11 auditory hearing acuity levels designated from Level I (for essentially normal hearing acuity) through Level XI (for profound deafness). 38 C.F.R. § 4.85, Tables VI and VII, DC 6100. Disability ratings for hearing loss are derived from a mechanical application of the rating schedule to the numeric designations resulting from audiometric testing. See Lendenmann v. Principi, 3 Vet. App. 345 (1992). The evaluations derived from the schedule are intended to make allowance for improvement by hearing aids. 38 C.F.R. § 4.85, DC 6100.

Exceptional patterns of hearing impairment are to be evaluated in accordance with the provisions of 38 C.F.R. § 4.86. That regulation states:

(a) When the puretone threshold at each of the four specified frequencies (1000, 2000, 3000 and 4000 Hertz) is 55 decibels or more, the rating specialist will determine the Roman numeral designation for hearing impairment from either Table VI or Table VIa, whichever results in the higher numeral. Each ear will be evaluated separately.

(b) When the puretone threshold is 30 decibels or less at 1000 Hertz, and 70 decibels or more at 2000 Hertz, the rating specialist will determine the Roman numeral designation for hearing impairment from either Table VI or Table VIa, whichever results in the higher numeral. That numeral will then be elevated to the next higher Roman numeral. Each ear will be evaluated separately.

An examination for hearing impairment for VA purposes must be conducted by a state-licensed audiologist and must include a controlled speech discrimination test (Maryland CNC) and a puretone audiometry test. 38 C.F.R. § 4.85(a).

This appeal dates from the Veteran's 2012 claim for service connection. In March 2013, he was afforded a VA C&P examination. The report revealed that puretone thresholds could not be established, as the results were deemed unreliable. Speech audiometry revealed speech recognition ability of 100 percent in the right ear and 96 percent in the left ear.

In November 2016, the Veteran submitted the results from a private audiogram. The results revealed puretone thresholds, in decibels, as follows:

 HERTZ 

 500 1000 2000 3000 4000

RIGHT 60 50 55 75 80

LEFT 60 45 45 75 75

The average decibel loss was 65 decibels in the right ear and 60 decibels in the left ear. Speech audiometry revealed speech recognition ability of 100 percent in both ears.

Applying Table VI of the rating schedule, the results of the November 2016 private audiogram reflect the Veteran had level II hearing acuity in both ears. Based on Table VII, these results correspond to a 0 percent rating. See 38 C.F.R. § 4.85

In March 2017, another VA C&P examination was performed. The test results show pure tone thresholds, in decibels, were as follows:

 HERTZ 

 500 1000 2000 3000 4000

RIGHT 75 60 65 80 75

LEFT 55 50 50 70 65

The average decibel loss was 70 decibels in the right ear and 59 decibels in the left ear. Speech audiometry revealed speech recognition ability of 98 percent in both ears.

The Board notes the March 2017 audiometric results show exceptional patterns of hearing impairment in the right ear. As such, the Board will apply either Table VI or Table VIa, whichever results in the higher numeral. 38 C.F.R. § 4.86(a). Here, applying Table VIa results in the higher numeral for the right ear, namely level VI hearing acuity. Applying Table VI to the left ear results in level II hearing acuity. Based on Table VII, these results correspond to a 10 percent rating. See 38 C.F.R. § 4.85.

In May 2018, a VA audiology note shows the Veteran has speech recognition thresholds at 70 decibels in both ears, with word recognition scores of 92 percent in both ears. It is not clear if these results showed exceptional patterns of hearing impairment; assuming they did not, these findings correspond to level II hearing acuity in both ears. Based on Table VII, these results correspond to a 10 percent rating. See id.

In September 2019, the Veteran underwent another VA C&P examination. The test results show pure tone thresholds, in decibels, were as follows:

 HERTZ 

 500 1000 2000 3000 4000

RIGHT 65 60 65 85 85

LEFT 60 50 55 85 75

The average decibel loss was 74 decibels in the right ear and 66 decibels in the left ear Speech audiometry revealed speech recognition ability of 100 percent in both ears.

These results again reflect exceptional patterns of hearing impairment in the right ear. As such, the Board will apply either Table VI or Table VIa, whichever results in the higher numeral. 38 C.F.R. § 4.86(a). Here, applying Table VIa results in the higher numeral for the right ear, namely level VI hearing acuity. Applying Table VI to the left ear results in level II hearing acuity. Based on Table VII, these results correspond to a 10 percent rating. See 38 C.F.R. § 4.85.

In addition to the audiometric studies referenced above, the Board has reviewed the Veteran's VA medical records. These records show the Veteran was followed for hearing loss and prescribed hearing aids, but do not include further audiometric studies or evidence necessitating discussion.

In this case, as illustrated above, the audiological examination of record indicates findings corresponding to no higher than a 10 percent rating. There is no probative evidence in the record that would suggest the Veteran's bilateral hearing loss was severe enough to warrant a higher rating. The Board has no reason to doubt the validity of either the private or the VA audiometric testing in this case.

As alluded to above, two of the C&P examination results demonstrated an exceptional pattern of hearing impairment in the Veteran's right ear. 38 C.F.R. § 4.86(a), (b). The Board has factored those findings in and has applied the more favorable Table VIa, as noted. The results still warrant only a 10 percent rating. There is no examiner certification that the use of speech discrimination testing was not appropriate due to factors such as language difficulties, inconsistent scores, etc.

The Veteran's subjective reports of hearing loss and resulting functional impairment have been considered. See Layno v. Brown, 6 Vet. App. 465, 469-70 (1994). However, a review of his lay statements gives no indication of specific symptoms or a particular degree of impairment that would justify a compensable rating. Moreover, the Board is bound to apply the VA rating schedule, under which the rating criteria are defined and limited by audiometric findings. This criteria measures hearing acuity directly in a controlled laboratory environment. In this regard, as discussed above, the private and VA audiometric findings demonstrate no basis for any increase in disability evaluation.

The Veteran has not alleged, and the evidence of record does not reflect, that his hearing loss worsened from the date of the September 2019 C&P examination to the date of the rating decision on appeal. The Veteran has not raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, 28 Vet. App. 366, 369-70 (2017) (confirming that the Board is not required to address issues unless they are specifically raised by the record).

In sum, the application of the rating schedule to the numeric designations assigned based on the private and VA audiological examination reports demonstrate that the appropriate rating for the Veteran's bilateral hearing loss is 10 percent, throughout the appeal period. The Veteran did not meet the criteria for a rating in excess of 10 percent during any discrete period involved in this appeal. Accordingly, his claim for an increased initial rating must be denied.

4. Bilateral tinnitus

The Veteran seeks an increased initial rating for his bilateral tinnitus. The Board notes that while the Veteran has not provided any specific argument in support of this claim, he stated in his April 2020 NOD that he was appealing "all issues" adjudicated in the October 2019 rating decision, including whether a rating in excess of 10 percent for bilateral tinnitus was warranted. The Board finds this appeal is not legally tenable.

The RO rated the Veteran's bilateral tinnitus under DC 6260 of 38 C.F.R. § 4.87. This DC provides a maximum rating of 10 percent. In Smith v. Nicholson, 19 Vet. App. 63, 78 (2005), the United States Court of Appeals for Veterans Claims (the Court) held that earlier versions of DC 6260 required the assignment of dual ratings for bilateral tinnitus. VA appealed this decision to the United States Court of Appeals for the Federal Circuit (Federal Circuit). In Smith v. Nicholson, 451 F.3d. 1344 (Fed. Cir. 2006), the Federal Circuit concluded that the Court erred in not deferring to VA's interpretation of its own regulations, 38 C.F.R. § 4.25(b) and DC 6260, which limit a veteran to a single disability rating for tinnitus, regardless of whether the tinnitus is unilateral or bilateral. 

The Veteran's bilateral tinnitus has been assigned the maximum schedular rating available for the disorder, pursuant to 38 C.F.R. § 4.87, DC 6260. As there is no legal basis upon which to award a higher schedular evaluation (or a separate evaluation for each ear), the Veteran's appeal must be denied. Sabonis v. Brown, 6 Vet. App. 426 (1994).

5. Cervical spine disability

The Veteran contends his cervical spine disability was more severe than his initial 10 percent rating reflects.

Initially the Board notes that although the rating schedule for evaluating musculoskeletal disabilities was amended effective February 7, 2021, here, the Board's review is limited to evidence of record at the time of the October 2019 AOJ decision. Because the rating schedule changed after the evidentiary window closed, there is no evidence to consider under the new criteria. 

Disabilities of the spine are evaluated under either the General Rating Formula for Diseases and Injuries of the Spine (General Rating Formula) or under the formula for rating intervertebral disc syndrome (IVDS) based on incapacitating episodes (DC 5243), whichever method results in the higher evaluation when all disabilities are combined under 38 C.F.R. § 4.25. The Veteran's cervical spine symptomatology is currently rated under the General Rating Formula. See 38 C.F.R. § 4.71(a), DC 5237.

Under the General Rating Formula, a 10 percent rating is warranted for forward flexion of the cervical spine greater than 30 degrees but not greater than 40 degrees; or, combined range of motion of the cervical spine greater than 170 degrees but not greater than 335 degrees; or, muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, vertebral body fracture with loss of 50 percent or more of the height. Id.

A 20 percent rating is assigned for forward flexion of the cervical spine greater than 15 degrees but not greater than 30 degrees; or, the combined range of motion of the cervical spine not greater than 170 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. Id.

A 30 percent rating is assigned for forward flexion of the cervical spine to 15 degrees or less; or, favorable ankylosis of the entire cervical spine. A 40 percent rating is assigned for unfavorable ankylosis of the entire cervical spine. Finally, a 100 percent rating is assigned for unfavorable ankylosis of the entire spine. Id.

Note (2) provides that, for VA compensation purposes, normal forward flexion of the cervical spine is zero to 45 degrees, normal extension is zero to 45 degrees, normal left and right lateral flexion are zero to 45 degrees, and normal left and right lateral rotation are zero to 80 degrees. Thus, the normal combined range of motion of the cervical spine is 340 degrees. Id.

The Board notes that when assessing the severity of a musculoskeletal disability that is rated on the basis of limitation of motion, VA must, in addition to applying schedular criteria, also consider evidence of pain, weakened movement, excess fatigability, or incoordination and determine the level of associated functional loss in light of 38 C.F.R. § 4.40, which requires VA to regard as "seriously disabled" any part of the musculoskeletal system that becomes painful on use. 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca v. Brown, 8 Vet. App. 202, 204-207 (1995).

This appeal period dates from the Veteran's 2012 claim for service connection. In March 2013, he was afforded a C&P examination for his neck. The report reflects a diagnosis of cervicalgia; he stated he suffered from chronic neck pain. He denied surgeries or cortisone injections but stated he used Meloxicam, hot showers, and daily stretching exercises. He also reported there was X-ray evidence of arthritis in his neck (an MRI from 2009 showed degenerative changes, which VA has incorporated into the Veteran's evaluation). The Veteran denied flare-ups of neck pain. Range of motion testing revealed forward flexion to 40 degrees with objective evidence of pain at 35 degrees; extension to 45 degrees without pain; right and left lateral flexion to 45 degrees; and right and left lateral rotation to 75 degrees. No additional functional loss was shown after repetitive-use testing. The examiner did not functional loss in the form of weakened movement, excess fatigability, and incoordination. There was no evidence of localized tenderness or pain to palpation for joints/soft tissue of the cervical spine. Guarding or spasm was present but did not result in abnormal gait or spinal contour. Muscle strength, reflexes, and sensation were normal. There was no evidence of radiculopathy or other neurologic abnormalities. The examiner noted the Veteran did not have IVDS and did not require assistive devices. Functional impact was minimal.

In June 2014, the Veteran received a VA orthopedic consult in which he denied any history of cervical spine problems. On examination it was indicated the cervical spine was within normal limits. There is no further evidence of treatment for the Veteran's neck condition. The Board notes the Veteran was scheduled for a C&P examination in September 2019 to evaluate his cervical spine disability. He did not report for this examination. Because the claim stems from an original compensation claim, the Board will rate the disability based on the evidence of record pursuant to 38 C.F.R. § 3.655(b).

Based on the above, the Board finds the weight of the evidence is against entitlement to an initial rating in excess of 10 percent, under the General Rating Formula, at any point during the period under review. 

The evidence discussed above shows the Veteran was able to obtain forward flexion of the cervical spine to greater than 30 degrees and combined range of motion to greater than 170 degrees, even when factoring in functional impairment in the form of painful motion, weakness, fatigue, and incoordination (the March 2013 C&P report shows these factors were present in the Veteran but did not indicate they caused functional loss equivalent to limitation of flexion to 30 degrees or less or combined range of motion of the cervical spine limited to 170 degrees or less). See 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca, 8 Vet. App. at 204-207. There is, furthermore, no evidence to indicate the Veteran's cervical spine has ever been ankylosed, favorably or otherwise. Under the criteria listed in the General Ratings Formula, such limitation warrants no higher than a 10 percent rating.

The Board notes the Veteran has not put forth specific lay allegations in support of his claim. Moreover, his lawyer's most recent brief, from April 2020, does not address his claim regarding his cervical spine disability. Nonetheless, to the extent the Veteran has made general allegations that his disability deserves an increased rating, Board finds the March 2013 C&P report and outpatient medical records are more probative, as the Veteran has not put forth specific reasons to question the expertise or test results of any of the examiners of record. Most important, the Veteran has put forth no evidence, lay or medical, to indicate his functional limitation was equivalent to forward flexion limited to 30 degrees or combined range of motion of the cervical spine limited to 170 degrees, as is required for an increased rating under the rating criteria. His current 10 percent rating contemplates a degree of functional impairment, including painful motion; thus, his lay statements alone, while credible, do not justify an increased rating, as none of the lay or medical evidence of record otherwise suggests restricted range of motion of the cervical spine to an extent that would warrant a rating in excess of 10 percent.

The weight of the evidence is also against a finding that the Veteran has suffered incapacitating episodes of IVDS warranting an increased rating under DC 5243 at any time during the appeal period. The Board acknowledges the Veteran has reported neck pain with accompanying functional limitation. He is of course competent to report these symptoms. See Layno, 6 Vet. App. 465; Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). Notwithstanding, none of the Veteran's lay statements or medical records, including the March 2013 C&P report, reflects incapacitating episodes of such a severity (i.e., requiring bedrest by a physician) or frequency as would warrant an increased rating under DC 5243. For these reasons, the weight of the evidence is against a finding of physician-prescribed bedrest specifically on account of IVDS for at least two weeks over a 12-month period.

The Board is aware of the Court decision in Sharp v. Shulkin, 29 Vet. App. 26 (2017), holding that when flare-ups are an indicated part of a claimant's service-connected disability, VA examiners are obligated to elicit information concerning the "severity, frequency, duration, or functional loss manifestations" of flare-ups. The Board is also aware of Correia v. McDonald, 28 Vet. App. 158 (2017), which directs VA to consider evidence of pain in non-weight bearing and in passive vs. active range of motion situations. As discussed above, the Veteran denied flare-ups during the only C&P examination of record and there is no evidence of additional functional limitation due to weight-bearing or passive range of motion situations. Moreover, VA attempted to schedule the Veteran for an updated examination in September 2019, which the Veteran declined. The Veteran has not alleged additional functional limitation due to flare-ups or in weight-bearing or passive range of motion situations. The Board finds that VA has complied with Sharp and Correia with respect to the Veteran's cervical spine disability.

The Board acknowledges that Note (1) to the General Rating Formula for Diseases and Injuries of the Spine directs VA to evaluate any associated objective neurologic abnormalities separately, under an appropriate DC. 38 C.F.R. § 4.71(a). There is no evidence of neurological impairment due to the Veteran's cervical spine disability. Neither the Veteran nor his lawyer have raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette, 28 Vet. App. at 369-70.

Accordingly, for the reasons discussed above, the Board finds the evidence of record does not warrant an initial rating in excess of 10 percent for the Veteran's cervical spine disability. The Veteran's claim must be denied.

REASONS FOR REMAND

1. Entitlement to service connection for sleep apnea is remanded.

2. Entitlement to service connection for headaches is remanded.

The Veteran seeks service connection for sleep apnea and headaches. He has put forth evidence that both disorders are directly due to service and are secondary to service-connected disease or injury. In particular, he submitted July 2017 evaluations from a private physician, Dr. Skaggs, opining (a) that the Veteran's sleep apnea developed in service and was caused and aggravated by chronic pain from his service-connected neck, back, and knee disabilities as well as by his PTSD; and (b) that the Veteran's headaches were likely caused and aggravated by his service-connected PTSD. 

The Board notes the Veteran was scheduled for C&P examinations for his sleep apnea and headaches in September 2019 but did not report for the examinations. Ordinarily, when a claimant fails to report for a medical examination scheduled in conjunction with an original compensation claim, without good cause, the claim shall be rated based on the evidence of record. 38 C.F.R. § 3.655(b). In this case, however, the Board finds that a medical opinion without the Veteran's participation would be sufficient to assist the Board in adjudicating these claims. The Board finds such opinions are needed to correct VA's pre-decisional duty to assist errors in these matters.

3. Entitlement to SMC based on aid and attendance/housebound status is remanded.

4. Entitlement to a TDIU is remanded.

The Veteran also seeks increased compensation in the form of SMC and an award of TDIU. The Board finds the pre-decisional duty to assist errors identified above extend to these issues. In particular, the requested medical opinions as to the nature and severity of the Veteran's sleep apnea and headaches could directly impact whether additional SMC and/or a TDIU are warranted. 

The matters are REMANDED for the following actions:

1. Forward the claims file to an examiner for an opinion to determine the nature and etiology of the Veteran's sleep apnea. The examiner is asked to review the claims file and opine as to the following, with consideration of the Veteran's lay statements:

(a) State whether the criteria for a diagnosis are met.

(b) Opine whether it is at least as likely as not (50 percent or greater probability) that the Veteran's sleep apnea was incurred in service or is otherwise related to his service.

(c) Opine whether it is at least as likely as not (50 percent or greater probability) that the Veteran's sleep apnea was caused or aggravated by any service-connected disability, to include chronic pain from his service-connected neck, back, and knee disabilities as well as by his PTSD.

 In addressing the question posed in (c), the examiner should specifically discuss the July 2017 evaluation and opinion provided by Dr. Skaggs, as well as all pertinent assertions raised in the Veteran's lawyer's April 2020 brief. 

If it is determined that there is another likely etiology for the Veteran's disability, that should be stated.

The examiner should set forth all examination findings, with a clear rationale for the conclusions reached. 

2. Forward the claims file to an examiner for an opinion to determine the nature and etiology of the Veteran's headaches. The examiner is asked to review the claims file and opine as to the following, with consideration of the Veteran's lay statements:

(a) State whether the criteria for a diagnosis are met.

(b) Opine whether it is at least as likely as not (50 percent or greater probability) that the Veteran's headaches were incurred in service or are otherwise related to his service.

(c) Opine whether it is at least as likely as not (50 percent or greater probability) that the Veteran's headaches were caused or aggravated by any service-connected disability, to include chronic pain from his service-connected neck, back, and knee disabilities as well as by his PTSD.

In addressing the question posed in (c), the examiner should specifically discuss the July 2017 evaluation and opinion provided by Dr. Skaggs, as well as all pertinent assertions raised in the Veteran's lawyer's April 2020 brief. 

If it is determined that there is another likely etiology for the Veteran's disability, that should be stated.

The examiner should set forth all examination findings, with a clear rationale for the conclusions reached.

 

 

AMANDA BAKER

Acting Veterans Law Judge

Board of Veterans' Appeals

Attorney for the Board C. Ryan, Associate Counsel

The Board's decision in this case is binding only with respect to the instant matter decided. This decision is not precedential and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.